# EXHIBIT A

FILED: KINGS COUNTY CLERK 03/13/2015 03:38 PM
NYSCEF DOC. NO. 1

INDEX NO. 502911/2015
RECEIVED NYSCEF: 03/13/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------x

CANYON BUILDING & DESIGN, LLC,                          :
                                                        :
            -against-                                   :        Index No. 502911/2015
                                                        :
                                        Plaintiff,      :        SUMMONS
                                                        :
NRB (USA), INC. WESTERN SURETY COMPANY, and             :
CNA SURETY                                              :
                                                        :
                                        Defendants      :
------------------------------------------------------------------x

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to
serve a copy of your answer on the Plaintiff's attorney within 20 after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete
is this summons is not personally delivered to you within the State of New York), and in
case of your failure to appear or answer, judgment will betaken against you by default for
the relief demanded in the complaint.

Dated:     New York, New York
           March 13, 2015

                                          Flora Edwards, Esq.
                                          *Attorney for Canyon Building & Design, LLC*
                                          115 Broadway - Suite 1505
                                          New York, New York 10006
                                          212-785-3344
                                          Fax: 212-577-2865
                                          FMELAW@aol.com

TO:    NRB (USA), Inc.
         440 Wenger Drive
         Ephrata, PA 17522

         WESTERN SURETY COMPANY
         Office of the General Counsel
         101 S. Phillips Avenue
         Sioux Falls, South Dakota 57104

         CNA SURETY
         Office of the General Counsel
         333 S Wabash - 41st Floor
         Chicago IL 60604



RECEIVED
MAR 20 2015
NRB (USA) INC.

FILED: KINGS COUNTY CLERK 03/13/2015 03:38 PM          INDEX NO. 502911/2015

NYSCEF DOC. NO. 2                                      RECEIVED NYSCEF: 03/13/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------------x

CANYON BUILDING & DESIGN, LLC,          :
                                        :
              -against-                 :       Index No. 5 0 2911/2015
                                        :
                          *Plaintiff*,  :       VERIFIED COMPLAINT
                                        :
NRB (USA), INC. and WESTERN SURETY COMPANY, :
CNA SURETY, INC.,                       :
                                        :
                          *Defendants*  :
-------------------------------------------------------------------------x

Plaintiff CANYON BUILDING & DESIGN, LLC ("Canyon") by its undersigned

attorney, complaining of the defendants, NRB (USA), INC. ("NRB"), WESTERN SURETY

COMPANY and CNA SURETY (collectively "THE SURETY") alleges as follows:

### THE PARTIES

1.      CANYON is a limited liability company organized under the laws of the

State of Arizona and authorized to do business in the State of New York with a principal

place of business at 4750 N. LaCholla Boulevard, Tucson, AZ.

2.      Upon information and belief NRB is a corporation organized and existing

under the laws of the State of Pennsylvania with a principal place of business at 440

Wenger Drive, Ephrata, PA 17522.

3.      Upon information and belief WESTERN SURETY COMPANY is a surety

company domiciled in Sioux Falls, South Dakota and licensed to issued bonds in the State

1

of New York.

4. Upon information and belief, CNA SURETY is a surety company domiciled in Chicago, Illlinois and is the parent company of WESTERN SURETY COMPANY

## GENERAL ALLEGATIONS

5. In or about December, 2013 CANYON entered into a contract with HIGHMARK INDEPENDENT, LLC for the construction of a new school located at 556 Columbia Street, Brooklyn, New York (hereinafter "the Project").

6. On December 6, 2013, NRB executed a sub-contract with CANYON for $10, 100,000.00 to provide labor, equipment and materials required for the entire scope of work for a Modular Building to be delivered as a complete system in strict accordance with the permitted set of construction drawings and specifications. A copy of the contract is annexed hereto as Exhibit A.

7. Pursuant to Section 5.4(a) of the subcontract, NRB was required to obtain a bond in the amount of the sub-contract.

8. On or about December 12, 2013, the SURETY issued Performance Bond No. 58708696 for $10,100,000.00 guaranteeing NRB's prompt and faithful performance of the work on the project. A copy of the Bond is annexed hereto as Exhibit B.

9. On February 18, 2015, NRB was served with a Notice of Default for failing to

2

(a) prosecute the work in accordance with the provisions of the contract (b) complete the agreed upon work in a timely fashion; (c) provide sufficient qualified supervision, labor and equipment; and (d ) to adhere to the protocols in the safety plan.

10.   In or about February, 2015 NRB filed a mechanic's lien against the job for $1,095,253 representing retainage held against the contract.

11.   Because the PROJECT has not reached substantial completion, the retainage has not been released and CANYON has not been paid for the retainage held against the NRB contract.

12.   On March 2, 2015 the SURETY was notified through its parent company CNA that NRB had defaulted under the Contract and that the damages substantially exceed the retainage held against the contract.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST NRB

13.   Plaintiffs repeats, reiterates and re-alleges each and every allegation contained in Paragraphs marked "1" through "12" inclusive of the Complaint with the same force and effect as if fully set forth herein.

14.   Defendant NRB agreed to be bound by the terms of the Contract.

15.   Defendant NRB failed to deliver a complete modular system in strict accordance with the permitted set of construction drawings and specifications.

16.   Canyon duly notified Defendant NRB of the deficiencies and provided NRB

3

with an opportunity to cure.

17.    NRB failed to cure the deficiencies.

18.    NRB breached the sub-contract agreement by failing to deliver a complete modular system in strict accordance with the permitted set of construction drawings and specifications.

19.    As a result of NRB's breach of contract, CANYON has been damaged in an amount to be determined at trial but exceeding $1,378,000.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST NRB

20.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs marked "1" through "19 inclusive of the Complaint with the same force and effect as if fully set forth herein.

21.    Pursuant to the terms of the subcontract,   NRB agreed to schedule and perform the Work by the stated completion date in the progress schedule.

22.    Pursuant to the terms of the subcontract, in the event NRB, its subcontractors, suppliers, consultants, agents, or employees delay the progress of the Work or cause any additional cost or expense (including overhead costs) to the Contractor or Owner, NRB shall reimburse Contractor and Owner for all costs and expenses directly or indirectly attributable to its performance failure, delay or interference.

23.    NRB breached the sub-contract bt failing to schedule and perform the Work

4

in accordance with the progress schedule.

24.    NRB breached the sub-contract by failing to reimburse CANYON and the Owner for the costs and expenses attributable to the delays caused by its performance failure.

25.    As a result of NRB's breach of contract, CANYON has been damaged in an amount to be determined at trial but exceeding $708,000.

## AS AND FOR A THIRD CAUSE OF ACTION

26.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs marked "1" through "25" inclusive of the Complaint with the same force and effect as if fully set forth herein.

27.    Pursuant to the Subcontract agreement SURETY Defendant WESTERN SURETY COMPANY issued Performance Bond #58708696 guaranteeing the prompt and faithful performance by NRB of its contractual obligations for the Project known as BASIS Brooklyn, Private School Project, 556 Columbia Street, Brooklyn, New York.

27.    Plaintiff faithfully and fully performed all of the conditions and covenants required of CANYON to be performed under the terms of the bond.

28.    By reason of the failure and neglect of defendant NRB to complete the sub-contract within the agreed time and in accordance with the drawings and specifications and by further reason of the damage suffered by CANYON in an amount to be determined

5

at trial, but exceeding $2,086,000, such amounts are due and owing the Plaintiff herein by defendant NRB, no part of which has been paid.

29.    Surety has failed to make payment on the Bond in accordance with the terms of the Bond such that the Surety is liable to Plaintiff for an amount to be determined at trial but not less than $2,086,000.


## AS AND FOR A FOURTH CAUSE OF ACTION

30.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs marked "1" through "29" inclusive of the Complaint with the same force and effect as if fully set forth herein.

31.    On or about February 10, 2015, NRB filed an alleged notice of lien in writing in the Office of the County Clerk for Kings County in the City of New York, wherein and whereby it claimed a lien pursuant to the N.Y. Lien Law against the project known as BASIS Brooklyn located at 556 Columbia Street, Brooklyn New York in the amount of $1,095,253 for labor alleged to have been performed and materials alleged to have been furnished by plaintiffs in the private improvement .

32.    On or about February 18, 2015, Canyon served a Demand for a Verified Statement by registered certified mail.

6

33.     NRB responded with a statement which failed to comply with Lien Law §38, but identified the demand for payment asserted in the lien as retainage.

34.     As a matter of law, a mechanic's lien attaches only to those funds due and owing to the general contractor at the time of its filing and may not be filed for retainage which has yet to be released to the contractor.

35.     The Project has not reached substantial completion and Canyon has not been paid for retainage.

36.     When NRB left the job, there was still work which remained under its contract in order to correct the deficiencies.

37.     NRB did wilfully exaggerate the amount of its lien as claimed in the notice of lien, as NRB well knew at the time it verified said notice of lien that the lien had impermissibly been imposed for retainage for which CANYON had yet to be paid.

38.     NRB having such knowledge, deliberately, intentionally and wilfully made, verified and filed the said notice of lien for the sum of $1,095,253.00.

39.     By reason of the wilful exaggeration of the said lien and the amounts claimed as aforesaid, CANYON has been damaged in the sum of $1,095,253, and they were required to bond said lien and were required to pay a premium therefor, and in an amount to be determined at trial but not less than $50,000 as the cost of the bond and reasonable attorney's fees for procuring discharge of said lien, and in the sum of $1,095,253 being the

7

difference by which the amount claimed to be due as stated in the notice of lien exceeded the amount actually due thereon at most.

WHEREFORE, defendants, demand judgment dismissing plaintiff's complaint in its entirely, together with judgment as follows:

1.     On Plaintiff's  First Cause of Action in a sum to be determined at trial, but believed to exceed $1,378,000.00  together with interest and costs;

2.     On Plaintiff's  Second Cause of Action in a sum to be determined at trial, but believed to exceed $708,000  together with interest and costs;

3.     On Plaintiff's  Third Cause of Action in a sum to be determined at trial  but believed to exceed $2,086,000 together with interest and costs;

4.     On Plaintiff's  Fourth Cause of Action in a sum to be determined at trial but believed to exceed $1,175,253.00

5.     Together with such other and further relief as to this Court may seem just and  proper, including interest, attorneys' fees and the costs and disbursements of this action.

Dated:        New York, New York
              March 13, 2015
                                          _____
                                          Flora Edwards, Esq.
                                          *Attorney for Plaintiff*
                                          *Canyon Building & Design, LLC*
                                          115 Broadway - Suite 1505
                                          New York, New York 10006
                                          212-785-3344
                                          FMELAW@aol.com

8

## VERIFICATION

FLORA EDWARDS, an attorney duly admitted to practice law in the State of New York affirms the following under penalties of perjury:

1. I am the attorney of record for the Defendant CANYON BUILDING & DESIGN, LLC.

2. I have read the annexed Verified Complaint , know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true. My belief as to those matters therein not stated upon knowledge is based upon conversations with my client and the facts, reports, statements, documents, data, etc. in my file pertaining to this matter.

3. The reason I make this Affirmation instead of Plaintiff is that Defendant is not located in the county where affiant maintains her practice.

Dated: New York, New York
      March 13, 2015

Flora Edwards

9

FILED: KINGS COUNTY CLERK 03/13/2015 03:38 PM

NYSCEF DOC. NO. 3

INDEX NO. 502947/2015

RECEIVED NYSCEF: 03/13/2015

# EXHIBIT A



## SUBCONTRACTOR AGREEMENT

This Subcontractor Agreement ("Agreement") is entered into this 5th day of December, 2013.

BETWEEN the CONTRACTOR:

Canyon Building & Design, LLC     Office: (520)299-7927
4750 N. La Cholla Boulevard     Fax: (520)299-7340
Tucson, AZ 85705
Contractor's License: 142441

and the SUBCONTRACTOR:

NRB (USA), Inc.     Office: (717) 733-1794
440 Wenger Drive     Fax:
Ephrata, PA 17522
Federal Tax ID:
Contractor's License(s):

The Contractor has made a contract for construction (herein, the Prime Contract) with the
OWNER:

Basis Schools, Inc.
11485 N. 136th Street Suite 109
Scottsdale, AZ 85259

For the following PROJECT:

BASIS Brooklyn
556 Columbia Street
Brooklyn, NY 11231

*The Prime Contract provides for the furnishing of labor, materials, equipment and services in connection with the construction of the Project. A Copy of the Prime Contract, consisting of the Agreement between Owner and Contractor (from which compensation amounts may be deleted) and the other Contract Documents enumerated therein, has been made available to the Subcontractor.*

The ARCHITECT for the Project:

Partners for Architecture, PC
48 Union Street
Stamford, CT 06906

Subcontract Agreement #: 130511128-06 Dated: 12/5/2013

(Initials) _____

## ARTICLE 1 - THE WORK

1.1 Subcontractor shall perform the following work:

(a) Provide labor, equipment and materials required for the entire scope of work regarding Modular Building.

(b) Deliver to the Project a complete system in strict accordance with the permitted set of construction drawings.

(c) Additional Information that applies specifically to the work: All required documentation must be on file at Canyon Building & Design, LLC prior to payment of invoices; including signed subcontracts, signed change orders, W-9 form, current insurance certificate, any required submittals, and closeout documents once requested.

(d) Exclusions are as follows: licenses, permits, sales taxes, unless negotiated at additional cost by the Subcontractor and Canyon Building & Design, LLC at a later time.

1.2 Subcontractor represents and warrants to Contractor and Owner that Subcontractor:

(a) Is financially solvent, able to pay its debts, and possesses sufficient working capital to fulfill its duties and obligations under this Agreement and complete the Project;

(b) NRB (USA), Inc. has been approved as a "temporary approved manufacturer under NYC Office of Technical Certification and Research, Buildings Bulletin 2011-009.

(c) Is an approved manufacturer in the State of New York; and

(d) holds any licenses, permits or other special evidence necessary to perform the Work.

Subcontractor acknowledges that Contractor is relying on Subcontractor's performance and that Subcontractor's adherence to and fulfillment of the terms and conditions of this Agreement is essential to the success of the Project.

1.3 Subcontractor represents and warrants that it has closely reviewed the Drawings, Specifications and the rest of the Contract Documents and is not aware of any material defect or error in such documents. Subcontractor further represents that it will be able to perform the Work in strict accordance with the Contract Documents for the Subcontract Amount (defined below).

## ARTICLE 2 - PERFORMANCE OF THE WORK

2.1 Subcontractor agrees, at its sole cost and expense, to furnish and pay, as applicable, all labor, materials, equipment, scaffolds, tools, fees, licenses, permits, insurance, taxes (including without limitation all applicable federal and state taxes) and all other items required to perform the Work. Subcontractor agrees to perform and complete the Work in a workmanlike and expeditious manner, in strict conformity with the Drawings and Specifications, with an adequate number of skilled and competent workers, in strict compliance with all applicable regulations, laws, customs, codes and ordinances and pursuant to the directions of Contractor.

2.2 Immediately after the execution of this Agreement, Subcontractor shall submit for review by Contractor and Architect the specified shop drawings and all samples, data and specifications of materials required to perform the Work. Subcontractor shall not fabricate or install any material without Contractor's and Architect's prior review of shop drawings and samples and approval of such installation or fabrication. Subcontractor shall prepare and submit to Contractor with a sufficient number of shop drawings for use at the jobsite. Contractor's review of the Subcontractor's shop drawings shall not relieve Subcontractor of its obligations and duties under this Agreement.

2.3 Upon receipt of the construction documents, Subcontractor shall prepare an expediting list, which includes all specified requirements for shop drawings and testing. Subcontractor shall submit periodic reports to Contractor describing the status of all items on the expediting list. The periodic status reports shall include the date the item is required, the date the item is promised for delivery and all other pertinent information.

Subcontract Agreement #: 190511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

## ARTICLE 3 - SAFETY

3.1 Subcontractor understands and agrees that it shall be solely responsible for establishing and maintaining a safe working environment in connection with the Work. It is Subcontractor's responsibility to inspect the Work area prior to commencing any Work and to report to Contractor in writing any unsafe or hazardous condition. Notwithstanding any other provisions in this Agreement, Subcontractor agrees that it will comply with all federal and state laws, ordinances, rules, regulations and codes regarding the health and safety of its employees, subcontractors, suppliers and agents.

3.2 Subcontractor acknowledges that the Project shall be a drug-free workplace. Subcontractor shall either adopt Contractor's corporate drug/alcohol testing policy or adhere to its own substantially similar policy upon written notice to Owner and Contractor (the "Policy"). Subcontractor understands and agrees that the Policy shall apply to Subcontractor's personnel during the course of the Work. Subcontractor also understands and agrees that it is responsible for disseminating and enforcing the Policy among its personnel. For purposes of the Policy, Subcontractor's personnel shall include without limitation Subcontractor's agents, employees, subcontractors and suppliers.

3.3 Without imposing a duty on the Contractor to test or monitor Subcontractor's personnel, Subcontractor understands and agrees that Contractor shall have the right to screen, and the right to require Subcontractor to screen, Subcontractor's personnel for compliance with the Policy in any manner Contractor may choose at Contractor's expense.

3.4 Subcontractor agrees to indemnify and defend Contractor and Owner (at Subcontractor's expense including attorney fees and court costs) for and against all costs, expenses, and liabilities arising directly or indirectly out of Contractor's enforcement of the Policy against Subcontractor's personnel.

## ARTICLE 4 - SCHEDULE

4.1 Subcontractor shall commence the Work when and where directed by Contractor in accordance with the Job Schedule. Subcontractor further agrees to stay informed of Contractor's schedule so that Subcontractor will have all required workers available and all necessary materials fabricated, delivered in accordance with the schedule provided to Subcontractor before execution of this Agreement. Subcontractor shall furnish to Contractor all requested scheduling information, including without limitation estimated man-days and anticipated crew size for each activity. Contractor will furnish a copy of the current Project schedule to Subcontractor upon Subcontractor's reasonable written request. Notwithstanding anything to the contrary herein, Subcontractor is not responsible for failure to meet delivery date or other deadlines in the Job/Project Schedule, Scheduled Start Date or Scheduled Completion Date if such failure is not due to the fault or neglect of Subcontractor or is caused by factors beyond Subcontractor's control including but not limited to the actions of third parties, design development, design revisions, material changes, unforeseen conditions or the site not being ready to receive the building. To the extent of such delays, deadlines and delivery dates shall be extended to fully account for such delays on a day for day basis.

4.2 Subcontractor shall start the Work on or before the *Scheduled Start Date set forth on Attachment "A"* and shall prosecute the Work according to the Project schedule as directed by Contractor. Subcontractor shall not interfere with or delay Contractor or any other subcontractor and shall complete the Work on or before *Scheduled Completion Date set forth on Attachment "A"* in accordance with Contractor's schedule. Subcontractor understands that Contractor is relying on Subcontractor's cooperation and performance to achieve the Project completion date. Time is of the essence in this Agreement.

4.3 Subcontractor shall schedule and perform the Work in conjunction with Contractor and other subcontractors. In agreeing to complete the Work by a date certain, Subcontractor has considered and allowed for the ordinary delays and hindrances incident to the Work, including without limitation common carrier delays, normal weather delays, typical problems associated with materials or workers (including strikes and labor disputes) and reasonable changes, omissions, and alterations to the Work.

4.4 Contractor may change or amend the progress schedule according to the conditions encountered during the Project. Subcontractor understands and agrees that a minor change in Contractor's Project Schedule shall not necessarily change this Agreement or the completion date for Subcontractor's Work. If any controversy, which is not settled by the parties, arises in connection with this Agreement, then Subcontractor shall follow the written orders of the Contractor and shall not delay the performance of the Work. Subcontractor acknowledges that Contractor reserves the right to schedule the Work in any manner it deems necessary to, in Contractor's judgment, complete the Project. Subcontractor shall be entitled to equitable adjustments of the contract price, including but not limited to any increase costs of labor, supervision, equipment or materials, and reasonable overhead and profit, for any modification of the project schedule differing from the bid schedule, and for any other delays, acceleration, out-of-sequence work and schedule changes beyond its reasonable control.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

2.4  Subcontractor shall furnish proof satisfactory to Contractor that all material orders and preliminary arrangements have been made to assure timely compliance with the requirements set forth in this Agreement.  The materials provided and the Work performed pursuant to this Agreement are subject to the review of Contractor, Architect and Owner. Subcontractor shall be available for Project Inspections at the direction of Contractor.

2.5  Subcontractor shall review and accept the condition of any work performed or materials supplied by lower-tier subcontractors related to the performance of the Work.  If Subcontractor observes any condition that is not in conformity with the Contract Documents or any condition that might prevent Subcontractor from properly performing the Work, Subcontractor must notify Contractor in writing of such nonconformity or condition immediately.

2.6  Subcontractor is responsible for laying out its own Work. Subcontractor is also responsible for handling its own materials, tools and equipment, including without limitation delivery, off-loading, hoisting and on-site distribution, in order to assure the timely completion of Subcontractor's Work.  Subcontractor shall at all times secure and protect its materials, tools, equipment and Work.

2.7  If Subcontractor's Work fails to comply with any of the provisions in the Contract Documents, Contractor, at its option, may require Subcontractor: (1) to remove or replace the objectionable Work; and/or (2) to pay in money the difference between the value of the Work performed and that which should have been performed.  Subcontractor shall pay Contractor for any loss or damage associated with Subcontractor's removal and replacement of objectionable Work.

2.8  Subcontractor shall use only personnel qualified by training and experience to perform the Work.  Subcontractor shall not use any incompetent, careless or unqualified personnel to perform the Work.  Subcontractor's representatives shall be able to speak English and to interpret the Drawings and Specifications.

2.9  At Contractor's written request, Subcontractor shall remove any of Subcontractor's personnel Contractor determines is careless, incompetent, or unqualified to perform the Work, or uncooperative with Contractor, Owner, Architect or their representatives.  If Contractor exercises its contractual right to require the removal of Subcontractor's personnel, Subcontractor must secure Contractor's written approval of proposed replacement personnel.  No increase in Subcontractor's costs shall be allowed for substitution of personnel.  Subcontractor agrees to indemnify and defend Contractor and Owner (at Subcontractor's expense, including attorney fees and court costs) for and against all costs, expenses, and liabilities arising directly or indirectly out of Subcontractor's replacement of personnel pursuant to this Agreement.

2.10  *Deleted*

2.11 Subcontractor shall assume toward Contractor with respect to Work performed or furnished by Subcontractor all of the obligations and responsibilities that Contractor assumes toward Owner, as specified in the General Contract between Owner and Contractor (except those provisions relating to the Contract Amount or Price), the general, supplementary and any other conditions to the General Contract, and the Drawings and Specifications (collectively, the "General Contract Documents") and any duly executed addenda, amendments and modifications thereto.  The General Contract Documents, and each of them, are hereby incorporated herein by this reference. Contractor and Subcontractor shall have the benefit of all rights and remedies, respectively, of Owner and Contractor under the General Contract Documents, except as otherwise expressly provided herein. Subcontractor acknowledges that it has carefully reviewed this Subcontractor Agreement, the General Contract Documents, and all other documents incorporated herein by reference and agrees to be bound thereby.  In the event of any conflict, inconsistency or discrepancy between any provisions in this Subcontractor Agreement and any related document or undertaking, the order of precedence in resolving such conflicts, inconsistencies or discrepancies shall be: first, this Subcontractor Agreement; second, any exhibits attached to this Subcontractor Agreement; third, the Drawing and Specifications; fourth, any shop drawings, product data, submittals, samples and other documentation specifically governing Subcontractor's work and approved by Contractor; fifth, the General Contract Documents; and sixth any other related documents.

2.12 Should it appear that the Work hereby intended to be done or the materials hereby intended to be furnished, or any matters related to said Work or materials, are not sufficiently detailed or explained herein, or in the General Contract Documents, Subcontractor shall apply in writing to Contractor for such other and further clarifications and explanations as may be necessary and shall conform to the same without extra compensation as part of this Subcontractor Agreement.  If Subcontractor performs any construction activity knowing or having reason to know it involves errors, inconsistencies and/or omissions, in such documents without first notifying Contractor of such activity and of such errors, inconsistencies and/or omissions, Subcontractor shall assume responsibility for such performance and shall bear the costs attributable to any correction.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____

4.5  Should the Subcontractor, its subcontractors, suppliers, consultants, agents, or employees delay the progress of the Work or cause any additional cost or expense (including overhead costs) to the Contractor or Owner, Subcontractor shall reimburse Contractor and Owner for all costs and expenses directly or indirectly attributable to Subcontractor's performance failure, delay or interference provided that Contractor provided advance written notice to Subcontractor and Subcontractor failed to correct.

4.6  Except as provided in 4.4, Contractor shall have no liability of any kind to Subcontractor for any costs or expenses or any actual or consequential damages due to the delays, acceleration, suspension, and/or performance failure, delay or interference directly or indirectly related to Subcontractor's Work.  Subcontractor understands and agrees that Subcontractor's sole and exclusive remedy for any delay shall be an extension of time in which Subcontractor must complete the Work; provided, however, Subcontractor may only receive an extension of time if and to the extent Contractor obtains a corresponding extension from the Owner unless the delays are Contractor-caused and not attributable to Owner .

## ARTICLE 5 - PAYMENT

5.1  In consideration for Subcontractor's prompt, faithful and complete performance of its obligations under this Agreement to the satisfaction of Owner, Contractor and Architect, and subject to the conditions precedent described in this Agreement, Contractor will pay to Subcontractor the amount *set forth on Attachment "A"* (the "Subcontract Amount").

5.2 In accordance with the Prompt Pay Act; New York General Business Law; If a subcontractor or material supplier has performed in accordance with the provisions of a construction contract, the contractor shall pay to its subcontractors or material suppliers and each subcontractor shall pay to its subcontractors or material suppliers within seven days of receipt by the contractor or subcontractor of each progress payment or final payment, the full amount received for such subcontractor's work and materials supplied based on work completed or materials supplied under the subcontract. The progress payment will be equal Ninety Percent (90%) of the value of the Work Subcontractor completed during the prior month, leaving a balance of Ten Percent (10%) of the value of the Work Subcontractor completed during the prior month,

5.3 *Deleted*

5.4  Subcontractor understands and agrees that, as further conditions precedent to Contractor's obligation to pay Subcontractor sums otherwise due under this Agreement, Subcontractor must execute and deliver to Contractor the following items:

(a)  If requested by Owner or Contractor, a bond (or other form of required assurance which is approved by Contractor in advance and in writing) in the Subcontract Amount executed by an approved surety.

(b)  Contractor's standard insurance certificate form(s) confirming Subcontractor's required policies and coverage

(c)  a partial or final waiver of lien with each invoice for payment; and

(d)  bills and receipts from Subcontractor's lower-tier consultants, subcontractors and suppliers for all expenses, including, without limitation, labor, material and overhead, and written releases from all parties that might assert claims against the Project. In the event any such releases from any of Subcontractor's lower-tier consultants, subcontractors and suppliers are conditional, Contractor reserves the right, but shall not have the obligation, to make direct or joint payments to such lower-tier consultant, subcontractor and supplier.

(e)  any other information and documentation Contractor reasonably believes is necessary for Subcontractor to substantiate payment amounts requested by Subcontractor.  Subcontractor must submit a payment application containing the required information and documentation.

5.5  Contractor's partial and/or final payment to Subcontractor shall not be evidence of the Subcontractor's partial or complete performance of the Work or this Agreement.  Furthermore, Contractor's partial and/or final payment to Subcontractor shall not be construed as an acceptance or waiver of defective Work or improper materials and shall not relieve Subcontractor of its obligations pursuant to this Agreement.  All indemnities, warranties, representations and other obligations for Subcontractor shall survive completion of the Subcontractor's Work and/or termination of the Subcontractor Agreement.  Acceptance of final payment shall constitute a waiver of all claims by Subcontractor relating to the Subcontractor's Work, but shall in no way relieve Subcontractor of responsibility or liability for warranty obligations assumed in the Subcontract for repair of defective work appearing after final payment.

*b. If the Contractor does not pay the Subcontractor through no fault if the Subcontractor, within seven (7) days from the time payment should be made as provided herein, Subcontractor may, without prejudice to any other available remedies, stop the Work of this Subcontract until payment of the amount owing has been received.*

5.6 Without limiting any other provisions entitling Contractor to withhold payments from Subcontractor, Contractor shall not be obligated to make any payments to Subcontractor, and may withhold or set-off amounts from Subcontractor, if any one or more of the following conditions exist:

(a) Subcontractor fails to perform any of its obligations or is in default under this Agreement;

(b) Subcontractor's subcontractors or suppliers file liens or claims against the Project that are not the result of Contractor's failure to pay Subcontractor;

(c) Subcontractor's performance of the Work is behind schedule due to its own fault or neglect and Contractor determines in good faith that either (i) Subcontractor has not diligently accelerated with Work after written notice and a failure to accelerate to Work ; or (ii) Subcontractor is behind schedule due to its own fault or neglect and will not, even with prompt acceleration of the Work, be able to adhere to the Project schedule or achieve timely completion;

(d) Contractor has not received the required documentation and information with Subcontractor's payment application;

(e) Subcontractor fails to pay its subcontractors and suppliers despite having received payment for such work from Contractor and in such instances, Contractor specifically reserves the right, but shall have no obligation, to make direct or joint payments to such subcontractors or suppliers;

(f) Subcontractor fails to provide the required assurances and/or insurance; and

(g) Contractor, Owner or Architect determines the Work does not comply with the Contract Documents.

When Subcontractor remedies or removes the applicable condition(s), then Contractor shall pay Subcontractor all payments withheld, subject to the conditions precedent to payment described in this Agreement.

5.7 To the extent a payment application submitted by Subcontractor identifies or reflects any payments made or to be made by Subcontractor to sub-subcontractors, sub-consultants, suppliers and/or material men (Subcontractor's Sub-trades), Subcontractor, in requesting such payments, thereby warrants and guarantees to Contractor that for each payment requested, all work represented by such payment has been performed to Subcontractor's reasonable satisfaction and/or all materials represented by such payment have been delivered to Subcontractor's reasonable satisfaction. Subcontractor therefore warrants that it has approved all such work and materials for payment as specified in the payment application. In addition, Subcontractor warrants that each payment to any of Subcontractor's Sub-trades that is reflected in the payment application has either already been made or that such payment will be made within seven (7) calendar days after Subcontractor's receipt from Contractor of such payment. Subcontractor shall be ineligible for any further payment until it has provided to Contractor documentary evidence of such payment to each of Subcontractor's Sub-trades.

## ARTICLE 6 - CHANGES AND EXTRA WORK

6.1 Contractor may change or amend the scope of the Work at the direction of Owner or Architect. Subcontractor shall submit Change Orders with all required backup information to Contractor for prior written approval at least five (5) business days prior to the time Contractor is required by the Contract Document to submit Change Orders to Owner for approval. Contractor is not obligated to pay Subcontractor for changes for which written notice has not been timely given and that are not approved by Contractor in advance and in writing.

6.2 Subcontractor shall prosecute the changed Work at the direction of Contractor and shall not rely on disagreements with Contractor about change pricing to delay the Work. Subcontractor's acceptance of a Change Order shall constitute a final settlement of all items included in such Change Order, pursuant to the terms of this Agreement. Each Change Order shall confirm Subcontractor's agreement with the cumulative effect and impact of all previous Change Orders. In the event the parties cannot agree on the amount of compensation to be paid to Subcontractor for changed or extra work, it shall be based on the time and materials incurred by Subcontractor as verified by Contractor, plus the markup for overhead and profit.

6.3 At Contractor's discretion, Contractor may direct Subcontractor to perform Extra Work. To facilitate Contractor's coordination of Extra Work, Subcontractor must complete Contractor's Extra Work Order form and provide a detailed estimate

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

describing all items of added and/or deleted Work, including labor and materials. Subcontractor must secure Contractor's written approval of any Extra Work prior to Subcontractor's execution of such Work.

6.4 Subcontractor's combined markup for overhead and profit on added Work shall not exceed fifteen percent (15%) of the direct cost of the additional Work. If a lower-tier subcontractor performs part or all of the additional Work, then NRB shall be compensated on the basis of the lower-tier subcontractor's costs plus a markup of five percent (5%) for handling, verification and coordination.

6.5 In the absence of a written Change Order executed by Contractor and Subcontractor and approved in writing by Owner, Subcontractor shall not receive any compensation for Work not identified in the Subcontractor Agreement or documents incorporated by reference herein, and Subcontractor shall not be entitled to any fees not identified herein.' Each claim for additional compensation and/or time must be made in writing within twenty-one (21) calendar days after the event(s) giving rise to the claim. Subcontractor's failure to provide such written notice shall result in forfeiture of the claim notwithstanding any common law principles to the contrary.

6.6 In the event of a significant delay or price increase of material, equipment or energy occurring during the performance of the Subcontract through no fault of the Subcontractor, the Contract sum, time of completion or Subcontract requirements shall be adjusted in accordance with the procedures of the Contract Documents. A change in price of an item of material, equipment or energy will be considered significant when the price of an item increases fifteen percent (15%) between the date of this Contract and the date of installation.

## ARTICLE 7 - WARRANTY AND GUARANTEE

7.1 In addition to the warranties required by the Contract Documents, Subcontractor specifically warrants and guarantees for the direct benefit of Contractor and Owner that the Work:
(a) shall be free from defects in materials and workmanship for a period of two (2) years after the Substantial Completion of the Project or longer if required by applicable Specifications, laws, rules, regulations, codes and/or ordinances;
(b) shall be construed in strict compliance with all applicable laws, rules, regulations, codes and/or ordinances and shall be fit and proper for its intended use; and
(c) does not incorporate or employ the use of any product, process or technique which may be protected by common lay or statutory patent, copyright or trade secret rights, unless Subcontractor is the lawful owner of license of such item.
Subcontractor acknowledges that its warranty shall cover at least the same terms and time period as Contractor's warranty to Owner.

7.3 All Subcontractor's warranties shall be assignable to Contractor and Owner. When the Work is complete and prior to final payment, Subcontractor shall assign, address and deliver to Contractor and Owner the warranties and guarantees relating to the Work.

7.4 Subcontractor shall furnish or obtain from its subcontractors and suppliers, as applicable, any warranties or guarantees which are specified or required by the Contract Documents to extend for more than two (2) years after Substantial Completion of the Project. Subcontractor shall assign such extended warranties and guarantees directly to Owner. Subcontractor acknowledges and agrees that Owner shall look directly to Subcontractor, its subcontractors and/or suppliers to enforce such extended warranties and guarantees.

7.5 Subcontractor understands and agrees that neither inspection nor payment shall be deemed a waiver or release of Subcontractor's obligations pursuant to this Agreement. Nothing contained in this Agreement shall limit or condition any of Subcontractor's warranty obligations to Contractor and Owner. Subcontractor shall indemnify and hold Contractor and Owner harmless from and against any direct and/or consequential damages resulting from Subcontractor's defective or non-conforming Work.

## ARTICLE 8 - BOND

8.1 Payment and performance bond must include a muti-obligee bond rider naming the owner and any third party beneficiaries as additional obliges under the payment and performance bond.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____

## ARTICLE 9 - INSURANCE

### NOTICE: THIS ARTICLE MAY NOT BE MODIFIED FOR ANY REASON.

9.1 Subcontractor shall promptly obtain insurance for the Work as specified in this Agreement. If the Subcontractor utilizes lower-tier subcontractors, Subcontractor will require identical insurance coverage and evidence of such coverage for Owner and Contractor from each such lower-tier subcontractor. Subcontractor shall provide insurance certificate(s) in form and substance satisfactory to Contractor evidencing all coverage required under this Agreement prior to commencing the Work and shall be liable to Contractor for the consequences of Subcontractor's delay in obtaining the required insurance policies and coverage's. Subcontractor acknowledges that it may not enter the jobsite until Contractor receives and approves the specified insurance certificate(s).

9.2 Each insurance certificate must state that the insurance carrier is required to give Contractor thirty (30) days' prior written notice of cancellation or material change which reduces or restricts the coverage's or liability limits of any insurance policy. Subcontractor's insurance certificate(s) shall also include the Project name in a conspicuous location. The insurance requirements described in this Agreement are not intended to and shall not in any way limit or qualify the liabilities and obligations Subcontractor assumes pursuant to this Agreement.

9.3 The insurance policies required in Articles 9.4.2, 9.4.3 and 9.4.4 shall: (1) name Owner and Contractor as additional insureds; (2) contain a waiver of subrogation in favor of Owner and Contractor; (3) State that such policies are primary and non-contributory with any insurance carried by Owner and/or Contractor. The following endorsement forms shall be incorporated into each such policy:

(a) Additional Insured forms providing both on-going and completed operations coverage and

(b) Waiver of Subrogation form

9.4 During the full term of the Work and of this Agreement, Subcontractor shall at all times maintain the following insurance coverage in primary and/or excess form, with limits not less than those described below, with insurers having a rating of no less than "A-/VII" in the most current edition of Best's Insurance Reports and licensed to do business in the State of New York and in forms or policies acceptable to Owner and Contractor:

9.4.1 Worker's Compensation Insurance:

Worker's Compensation: Statutory Limits
Employer's Liability:
Bodily Injury by Accident - $500,000 Each Accident Bodily Injury by Disease - $500,000 Policy Limit Bodily Injury by Disease - $500,000 Each Employee

The Worker's Compensation Policy shall cover all Subcontractors' jobsite employees and include a waiver of subrogation in favor of Owner and Contractor.

9.4.2 Commercial General Liability Insurance:

Commercial general liability insurance on an occurrence basis in the amount of $1,000,000 each occurrence, $2,000,000 products/completed operations aggregate, $2,000,000 general aggregate and $1,000,000 personal injury and advertising injury for bodily injury and/or property damage combined and including:

(a) Premises and operations coverage with blasting, collapse and underground coverage included;

(b) Independent contractors protective;

(c) Products and completed operations coverage;

(d) Broad form contractual coverage including both oral and written contracts covering the liability assumed under the indemnity and insurance provisions of this Agreement;

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____

(e) Personal injury coverage with exclusions related to discrimination and contractual liability deleted;

(f) Broad form property damage coverage including completed operations;

(g) An endorsement naming Owner, Contractor, and their partners, officers, agents, employees, volunteers and owners as additional insured's, providing "your work" coverage (including both on-going and completed operations) arising out of work performed for the Contractor by the Subcontractor. Completed operations additional insured status to continue thru the statue of repose.

(h) An endorsement providing that such insurance as is afforded under Subcontractor's policy is primary insurance as respects Owner, its officers, agents, employees, volunteers and owners and that any other insurance maintained by Owner and owner is excess and non-contributing with the insurance required hereunder; and,

(i) An endorsement making the general aggregate limit applicable to each project. No endorsement limiting or excluding a required coverage is permitted.

9.4.3 Comprehensive Automobile Liability Insurance:

Bodily Injury and Property Damage: $1,000,000 each occurrence for bodily injury and/or property to damage liability

The Comprehensive Automobile Liability Policy shall be written on a standard form and cover all owned, non-owned and hired automobiles.

9.4.4 Umbrella (Excess) Insurance:

Bodily Injury and Property Damage: $1,000,000 per occurrence and aggregate

The Umbrella (Excess) Policy shall provide coverage that is as broad as the primary policy and the limits shall be in addition to those provided by the coverages required in Articles 9.4.1, 9.4.2 and 9.4.3.

9.4.5 Subcontractor's Equipment Insurance:

Subcontractor's equipment insurance shall protect Subcontractor against losses caused by physical damage to all Subcontractor's tools, equipment and materials which are used to perform the Work but which are not incorporated into the Work. Subcontractor shall waive its right of subrogation against Contractor and Owner.

9.5 RESERVED - Professional Liability Insurance not required for this agreement.

9.6 Maintenance of Insurance:

Subcontractor shall maintain all of the foregoing insurance coverage in force until final completion and acceptance of the Work other than the products and completed operations coverage required under paragraph 9.4.2.c and endorsements specified in 9.4.2.g, h and i, above which shall be maintained in force until expiration of the applicable statute of limitation for claims related to latent defects in construction of improvements to real property. In addition, all policies shall be endorsed to obligate the carrier to give 30 days prior written notice to Contractor and Owner in event of cancellation, non-renewal or material change in coverage.

9.7 Builder's Risk Insurance:

Owner or Contractor may provide Builder's Risk Insurance for the entire Project, insuring all risks of direct physical loss or damages to materials, equipment, machinery and other property incorporated in the Project, subject to policy exclusions and deductibles. Builder's Risk Insurance will not provide coverage for tools, equipment, or other items which Subcontractor uses in connection with the Work and which are not intended to become a permanent part of the Work. Subcontractor shall waive its right of subrogation against Owner and Contractor for damage caused by fire or other perils to the extent such damage is covered by the Builder's Risk policy. If Subcontractor makes a claim on the Builder's Risk policy, Subcontractor shall pay its pro rata share of the policy's deductible amount up to and including one hundred percent (100%) if applicable.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

## ARTICLE 10 - GENERAL INDEMNITY

10.1 Subcontractor, its agents, consultants, employees, subcontractors, suppliers and other parties for whom the Subcontractor is legally responsible (collectively "Indemnitors") shall jointly and severally indemnify, hold harmless and defend Contractor and Owner, and their respective employees, officers, shareholders, directors, agents, consultants, representatives, successors, assigns, partners, and parent, subsidiary and affiliated companies (collectively "Indemnitees"), at the Indemnitors' expense (including attorney fees), for and against costs, expenses, claims, liabilities, demands, causes of action and judgments (collectively "Claims") directly, indirectly, passively or actively arising from and to the extent of the Subcontractor' negligent performance of the Work, breach of this Agreement, including without limitations:

(a) personal injury and/or death of any person;

(b) property loss or damage;

(c) any act or omission of an Indemnitor;

(d) the performance of construction services, including without limitation deficiencies or inadequacies in construction by an Indemnitor;

(e) the performance of design services, including without limitation errors or omissions in design, specification, shop drawing or engineering; and/or

(f) an Indemnitor's use of an Indemnitee's owned or rented machinery, equipment, tools, scaffolding, hoist, and/or other similar items.

10.2 Subcontractor expressly agrees that its obligations of defense and indemnification shall apply to all Claims caused by (1) the negligence of any Indemnitor and/or (2) the joint negligence of any Indemnitor and any Indemnitee; provided however Subcontractor's obligations of defense and indemnification shall not apply to any claims caused by the willful misconduct or sole negligence of an Indemnitee, unless otherwise required in this Agreement, and shall only apply to the extent of or in proportion to Subcontractor's negligence. Subcontractor understands and agrees that its obligations of defense and indemnification and Contractor's limitation of liability shall control over any conflicting provision in the Contract Documents and shall survive the termination or expiration of this Subcontract.

10.3 *Deleted*

10.4 Subcontractor understands and agrees that with respect to any current or future legal limitations affecting the validity or enforceability of Subcontractor's obligations of defense and indemnification, such legal limitations are and shall be automatically incorporated into Subcontractor's obligations and shall operate to amend such obligations to the minimum extent necessary to render such obligations in conformity with the requirements of the current or future legal limitation. Subcontractor further understands and agrees that its modified obligations of defense and indemnification shall thereafter continue in full force and effect.

## ARTICLE 11 - LIENS AND CLAIMS

11.1 When Subcontractor is paid for the Work, Subcontractor shall pay its agents, subcontractors and suppliers promptly for all labor, materials and other expenses incurred in connection with this Agreement and shall indemnify Owner, Contractor and the property comprising the Project from all claims, liens, judgments, court costs, attorney fees, and expenses resulting from Subcontractor's failure to pay its agents, subcontractors or suppliers and/or its failure to otherwise comply with this Agreement.

11.2 Except where caused by Contractor's failure to pay Subcontractor for Work, if any person or entity asserts a claim or lien for materials, labor, services or other items furnished or fabricated pursuant to this Agreement and if such claim or lien could create liability for Owner, Contractor or the property comprising the Project, the Contractor may retain from any payment otherwise due Subcontractor the funds necessary to protect and indemnify Owner, Contractor and the property from such claim or lien. Subcontractor shall promptly satisfy, discharge and remove any claim or lien asserted in connection with this Agreement and shall execute a bond if necessary to do so. If a claim or lien is asserted and Subcontractor fails to satisfy or remove the claim or

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____

lien within ten (10) days of its assertion, the Subcontractor and/or its surety shall reimburse Contractor promptly for all costs and expenses incurred by Contractor and Owner in satisfying or discharging such claim or lien.

11.3 If Owner and Contractor agree to enter into an arbitration proceeding with respect to any matter arising out of or relating to the Work or the Project, Subcontractor shall and does consent to enter into and be bound by such proceedings and shall immediately discontinue the pursuit, through the courts or otherwise, of any claims, disputes or other matters associated with the Work or the Project which relate in whole or in part to the arbitrated dispute. Nothing in this provision shall be deemed or construed as an intent or obligation to arbitrate any matter or dispute. Contractor and Subcontractor agree that any award or settlement rendered in such arbitration may be enforced by any court of competent jurisdiction.

11.4 Subcontractor must present all claims against Contractor, Owner and/or Architect no more than ten (10) days after Subcontractor becomes aware or should have become aware that a claim may exist. Subcontractor must describe in writing the nature and amount of the claim and must submit such written notification to Contractor. Subcontractor expressly waives all claims not presented as described in this provision.

## ARTICLE 12 - DEFAULT AND TERMINATIONS

12.1 If Subcontractor ever:

(a) refuses or neglects to supply a sufficient number of properly skilled workers (including without limitation failure to supply such workers due to strikes, picketing, slowdowns or any labor dispute) or materials in proper quality or quantity;

(b) fails in any respect to prosecute all or part of the Work with promptness and diligence;

(c) fails to perform or honor any of the provisions in this Agreement; or

(d) becomes insolvent, bankrupt or is put into receivership,

then Subcontractor shall be in default and Contractor may, after five (5) days written notice to Subcontractor and a failure by Subcontractor to promptly commence cure, (1) provide any labor and materials necessary to perform the Work and deduct the cost of such labor and materials from any funds due or potentially due to Subcontractor pursuant to this Agreement, and/or (2) terminate for cause Subcontractor's right to proceed with the Work or any part of the Work.

12.2 If Contractor terminates any part or all of this Agreement for cause, Contractor may enter Subcontractor's premises and, for the purpose of completing this Work, take possession of all Project items, such as materials, equipment, tools and appliances for which payment has been made to Subcontractor, and may finish the Work by whatever method Contractor in its sole and absolute discretion deems expedient, including hiring another subcontractor if necessary. If Contractor terminates any part or all of this Agreement for cause, then Subcontractor shall not be entitled to receive any further payment until the Work is completed; provided, however, if the unpaid balance of the amount due to Subcontractor for Work completed prior to default exceeds the cost of finishing Subcontractor's Work, plus all other costs and damages Contractor may incur because of Subcontractor's default, then Contractor shall pay such excess to Subcontractor. If such costs and damages exceed the unpaid balance due to Subcontractor, then Subcontractor and its sureties shall be liable for that deficiency amount and shall promptly pay such amount to Contractor.

12.3 Contractor may at any time, in its sole and absolute discretion, terminate any part or all of the Agreement for any reason or no reason. Such termination for convenience shall be effective immediately by giving Subcontractor written notice. Subcontractor shall continue to prosecute any part of the Agreement not terminated. Subcontractor shall require a termination provision comparable to this provision in all lower-tier subcontractors and purchase orders.

12.4 If Contractor terminates any part or all of this Agreement for convenience, Contractor shall incur no liability to Subcontractor because of such termination, except that Subcontractor shall be entitled to payment for: (i) work properly executed in accordance with this Agreement prior to the effective date of the termination; and (ii) reasonable cancellation costs directly related to such termination.

12.5 Subcontractor understands and agrees that the default and termination provisions contained in this Agreement are intended to allow Contractor to complete its obligations to Owner. If Subcontractor is in default, Contractor shall have the right

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

to take possession of Subcontractor's Project items, such as materials, equipment, tools and appliances, for which payment has been made to Subcontractor in order to finish the Work except where Contractor is in breach of a provision in the Contract Documents. Subcontractor expressly authorizes such actions by Contractor and agrees that such actions shall not constitute a conversion of the Project items or any other wrongful conduct.

12.6 Termination of this Agreement either for cause or for convenience shall not affect any right or obligation, which is accrued or vested prior to such termination. Any provision in the Contract Documents relating to such right or obligation shall survive the termination of this Subcontract.

## ARTICLE 13 - THE CONTRACT DOCUMENTS

13.1 The Contract Documents for this Agreement are:

(a) this Agreement and all Attachments (including without limitation Attachments "A") including NRG' Pre-construction Agreement signed by Don Engle on September 25, 2013, NRG's: Basis - Scope of Work – NRG, dated 12-02-13, Schedule dated 11-27-13 , Scope of Work Drawings dated 12-04-13, and Basis – No 1st - Cost Analysis Sheet dated 12-02-13.

(b) the Agreement between Owner and Contractor;

(c) the Conditions of the Contract between Owner and Contractor (including without limitation all General, Supplementary and other Conditions);

(d) the Drawings and Specifications; and

(e) any addenda, revisions, modifications, additions and deletions to the Contract Documents that are described by written Attachment and/or Change Order.

13.2 The Contract Documents represent the entire and integrated agreement between Subcontractor and Contractor and supersedes all previous understandings, whether oral or written. This Agreement may only be modified by writing, signed by Contractor and Subcontractor. This Agreement shall control over any conflicting provision in the Contract Documents.

13.3 By executing this Agreement, Subcontractor represents that it has carefully reviewed and agrees to be bound by all the Contract Documents. Subcontractor specifically agrees to incorporate all the applicable terms of the Agreement between Owner and Contractor. Subcontractor may inspect the Contract Documents at Contractor's office during regular business hours upon reasonable notice to Contractor.

13.4 All contractual agreements between Subcontractor and any lower-tier subcontractor or supplier are subject to the review and approval of Contractor and Owner and shall include the same terms and conditions contained in this Agreement. At Contractor's request, Subcontractor shall provide, and shall require its lower-tier subcontractors and suppliers to provide to Contractor a copy of each subcontract agreement and/or purchase order between Subcontractor and its lower-tier subcontractor or supplier with the pricing information deleted. Subcontractor shall include this requirement in all its subcontracts and purchase orders.

## ARTICLE 14 - MISCELLANEOUS PROVISIONS

14.1 THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK.

14.2 Subcontractor shall not assign or transfer this Agreement in whole or in part without Contractor's prior written approval of such assignment or transfer. Contractor reserves the right to assign this Agreement to the Owner or Owner's assigns.

14.3 Notwithstanding any provision to the contrary in this Agreement, Subcontractor shall in all respects be acting as an independent contractor and under no circumstances shall be considered an agent, employee or partner of Contractor.

14.4 If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement and all other provisions shall remain in full force and effect.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____

14.5 The parties acknowledge that each party and, if it chooses, its counsel have reviewed this Agreement and that the rule of contract construction requiring any ambiguities to be resolved against the drafting party shall not be utilized in the interpretation of this Agreement or any amendments, attachments, or exhibits to this Agreement. The parties further acknowledge that the descriptive headings are included for convenience only and shall not be considered in the construction and interpretation of any provision of this Agreement.

14.6 If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, then the prevailing party shall be entitled to reasonable costs, attorney fees and court costs, and necessary disbursements, in addition to any other relief to which it may be entitled.

14.7 Contractor's failure to give notice of any Subcontractor breach or Contractor's failure to require Subcontractor's compliance with any condition or provision of this Agreement shall not be deemed or construed as a waiver of any similar or dissimilar provisions or conditions at any identical, prior or subsequent time.

14.8 Unless otherwise specifically limited in this Agreement, the duties and obligations imposed by this Agreement, and the corresponding rights and remedies, shall be in addition to and not in limitation of any duties, obligations, rights and remedies otherwise imposed by or available at law or in equity.

Subcontract Agreement #: 130511128-06 Dated: 12/05/2013

(Initials) _____
12/06/13

THE PARTIES EXECUTED THIS AGREEMENT ON THE DAY AND DATE FIRST WRITTEN ABOVE

CONTRACTOR:

CANYON BUILDING & DESIGN, LLC,
an Arizona Limited Liability Company

By:

Title:

Date: 12-6-2013

SUBCONTRACTOR:

NRB (USA), INC.

By:

Title: GENERAL MANAGER

Date: DEC. 06, 2013

Subcontract Agreement #: 190511128-06 Dated: 12/5/2013

(Initials)

ATTACHMENT "A"

to

Agreement

by and between

**CANYON BUILDING & DESIGN, LLC, an Arizona Limited Liability Company and below referenced Subcontractor regarding the below referenced Project**

SUBCONTRACTOR NAME:   NRB (USA), Inc.

PROJECT:   BASIS Brooklyn

   Canyon Building & Design, LLC Job Number: 13-0511-128
   Subcontract Number: 130511128-06

1. <u>SCOPE OF WORK</u>: Scope of work is per attached Basis - Scope of Work - NRB dated 12.02.13. In addition, subcontractor shall furnish all labor, equipment, and new materials required to perform all work necessary, indicated, reasonably inferred, or required by local jurisdiction to complete their scope of work for a complete and properly finished job based on your experience, site visits, and evaluation of existing conditions, and in accordance with the plans & specifications provided by Partners for Architecture dated 11.01.13. NRB (USA), Inc's 50 drawings, labeled X-101.00 through X-612.00, dated 12/3/2013 and NRB (USA), Inc's Pricing/Cost Analysis dated 12/02/2013, 2 pages attached hereto, and made part of this agreement. A detailed breakdown of NRB's Schedule of Values is required with each months billing.

INCLUSIONS:

1. A structural steel construction set of drawings (second floor through and including penthouse of original modular portion), approved, signed by a NY State licensed professional Engineer, will be provided on or before December 20, 2013.

..2. This is an all in agreement; there are no exclusions, other than stated in our contract. Any items required as it pertains to your phase of the project to render a complete installation are included in this agreement.   *[initialed]* 12/00/13

3. As time is of the essence, submittals shall be quickly processed for approval upon receipt of any completed design drawings and specifications.

2. <u>SCHEDULED START DATE:</u>                                            12/16/2013
3. <u>SCHEDULED COMPLETION DATE:</u>                              5/30/2014
4. <u>CONTRACT AMOUNT:</u>                                               $10,100,000.00

<u>Not to Exceed Ten Million One Hundred  Thousand and 00/100.</u>

Subcontract Agreement #: 130511128-06 Dated: 12/5/2013

(Initials) *[initialed]* 12/00/13

# NRB (USA), Inc.

**NRB** modular building specialists

| | |
|---|---|
| **CUSTOMER:** | Canyon Building and Design |
| **PROJECT:** | Basis Independent Red Hook School (1ST FLOOR 10,121 SF DEDUCTED) |
| **SQ. FT.** | 61,784 |
| **ESTIMATOR:** | VARIOUS |
| **REVIEWED:** | JKS |

| Pricing/Cost Analysis | | Current Estimated Cost (12-02-13) | Cost / SF | NOTES: (/SF cost is based on floor SF not surface) |
|---|---|---|---|---|
| **Building** | | | | |
| 01300 | Bond - Payment and Performance | $ 63,462.00 | 1.03 | |
| 01300 | General Conditions/Admin | $ 84,644.00 | 1.37 | |
| 01300 | Draw / Eng / Insp / Test | $ 77,193.00 | 1.25 | (INCLUDES 20% WELD TESTING) |
| 03300 | Cast-in-place Concrete & Finishing (4" LIGHTWEIGHT) | $ 226,129.00 | 3.66 | Includes increased Thickness and Steel Mesh for Fire Rating |
| 05120 | Structural Steel & Fabrication | $ 1,620,229.00 | 26.22 | |
| 05310 | Steel Floor/Roof Decking | $ 217,480.00 | 3.52 | |
| 05500 | Misc. Metals / Misc. Fabrications | $ 320,507.00 | 5.19 | Includes Stairs/Rails (Installed in C in modular building, Stair A & B shipped loose for site install) and Steel "Style 1" Cafeteria Rails |
| 06100 | Rough Carpentry (NRB) | $ 30,274.00 | 0.49 | |
| 06100 | Finish Carpentry (NRB) | $ 12,975.00 | 0.21 | |
| 06400 | Casework/Millwork | $ 86,392.00 | 1.40 | Allowance Only - SHIP LOOSE FOR FIRST |
| 07210 | Insulation | $ 67,982.00 | 1.10 | Includes Batts (No Cellulose vendors bid) |
| 07270 | Air/Weather Barrier | $ 39,671.00 | 0.64 | Vaproshield for Rain Screen |
| 07450 | Fiber Cement Siding and Trims/Flashings | $ 410,131.00 | 6.64 | Includes Tamlyn Extreme Trim, EZ trim non-responsive, Includes ship loose site area materials |
| 07500 | Roofing & Assoc. Insulation/Flashings/Metal | $ 296,000.00 | 4.79 | Fiberlite roofing reflected in this pricing, see option deduct to use White EPDM as initially budgeted (Includes Temp. Roofing @ NRB during Const.) |
| 07810 | Applied Fireproofing | $ 476,210.00 | 7.71 | |
| 07920 | Joint Sealants / Caulking | $ 7,414.00 | 0.12 | |
| 08000 | Doors and Hardware | $ 224,191.00 | 3.63 | Includes ship loose of doors/hardware on 1st floor |
| 08500 | Aluminum Doors / Windows / Store Fronts located in modular scope | $ 575,280.00 | 9.31 | (Includes Ship loose of Storefronts in all Site Built Areas) |
| 09100 | Walls/Ceilings: Light Gauge/Gypsum | $ 666,106.00 | 10.78 | |
| 09311 | Ceramic Tile | $ 65,000.00 | 1.05 | Allowance Only (6' High Walls, total @ 3,843 SF / Floors total @ 1,620 SF ) Based on DALtile 2x2 Keystones floor tile group 1 or 2 and Daltile 4x4 semi-gloss group 1 or 2 wall tile and cove base in lieu of Natural Hues tile listed in finish schedule |
| 09900 | Paints & Coatings | $ 27,802.00 | 0.45 | Prime only, Excludes ceiling deck painting and sprinkler pipe painting |

# NRB (USA), Inc.

**NRB**
modular building specialists

| | |
|---|---|
| CUSTOMER: | Canyon Building and Design |
| PROJECT: | Basis Independent Red Hook School (1ST FLOOR 10,121 SF DEDUCTED) |
| SQ. FT. | 61,784 |
| ESTIMATOR: | VARIOUS |
| REVIEWED: | JKS |

| | Pricing/Cost Analysis | Current Estimated Cost (12-02-HB) | Cost / SF | NOTES: |
|---|---|---|---|---|
| 10800 | Toilet Accessories / Specialties | $ 51,902.00 | 0.84 | Lockers and Marker/Tacks Excluded |
| 11600 | Lab Casework and Accessories | $ 80,000.00 | 1.29 | Allowance Only |
| 22000 | Sprinkler System | $ 129,748.00 | 2.10 | |
| 22000 | Plumbing Total System | $ 659,407.00 | 10.67 | Allowance Only |
| 23000 | HVAC Total System | $ 1,699,077.00 | 27.50 | INCLUDES RTUS |
| 26000 | Electrical - Total System | $ 779,314.00 | 12.61 | Includes Gear Package (shipped loose for site built areas), Includes lighting only located in modular building/scope, 1st floor lighting excluded |
| Misc. | Freight - Ship / Wrap / Loading | $ 1,105,542.00 | 17.89 | |
| | **NRB Total** | 10,100,000.00 | 163.47 | |

FILED: KINGS COUNTY CLERK 03/13/2015 03:38 PM
NYSCEF DOC. NO. 4

INDEX NO. 502911/2015

RECEIVED NYSCEF: 03/13/2015

# EXHIBIT B

Bond No. 58708696

## PERFORMANCE BOND

The American Institute of Architects,
AIA Document No. A311 (February, 1970 Edition)

KNOW ALL MEN BY THESE PRESENTS: that NRB(USA), INC.   440 Wenger Drive, Ephrata, PA 17522
(Here insert full name and address or legal title of Contractor)

as Principal, hereinafter called Contractor, and, WESTERN SURETY COMPANY
(Here insert full name and address or legal title of Surety)
101 S. Phillips Avenue, Sioux Falls, South Dakota 57104

as Surety, hereinafter called Surety, are held and firmly bound unto Canyon Building & Design, LLC
(Here insert full name and address or legal title of Owner)
4760 N. LaCholla Blvd, Tucson, AZ  85705

as Obligee, hereinafter called Owner, in the amount of Ten Million, One Hundred Thousand........................00/100

Dollars ($ 10,100,000.00 ), for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, NRB(USA), INC.

Contractor has by written agreement dated December 6th ,  2013 , entered into a contract with Owner for

Basis Brooklyn, Private School Project, 556 Columbia St., Brooklyn, NY in accordance with Drawings and Specifications prepared by

Partners for Architecture, PC. 48 Union Street Stamford, CT  0690
(Here insert full name and address or legal title of Architect)

which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The Surety hereby waives notice of any alteration or extension of time made by the Owner.

Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

1) Complete the Contract in accordance with its terms and conditions, or

2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or, if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest

responsible bidder, arrange for a contract between such bidder and Owner, and make available as Work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein or the heirs, executors, administrators or successors of the Owner.

Signed and sealed this 12th day of December 2013

NRB(USA), INC.
(Witness)        (Principal)        (Seal)
GENERAL MANAGER (Title)

(Witness)
Martin Harvey, Attorney-In-Fact

WESTERN SURETY COMPANY
(Surety)        (Seal)
A. Arthur McCullagh  Attorney-In-Fact (Title)

Performance/Labor and Material Payment Bond
Revised to February, 1970
SB 5716b (1) Printed in U.S.A.

Bond No. 58708696

## LABOR AND MATERIAL PAYMENT BOND

The American Institute of Architects, AIA Document No. A311 (February, 1970 Edition)
THIS BOND IS ISSUED SIMULTANEOUSLY WITH PERFORMANCE BOND IN FAVOR OF THE
OWNER CONDITIONED ON THE FULL AND FAITHFUL PERFORMANCE OF THE CONTRACT

KNOW ALL MEN BY THESE PRESENTS: that __NRB(USA), INC.__   440 Wenger Drive, Ephrata, PA 17522
(Here insert full name and address or legal title of Contractor)

as Principal, hereinafter called Principal, and, __WESTERN SURETY COMPANY__
(Here insert full name and address or legal title of Surety)
101 S. Phillips Avenue, Sioux Falls, South Dakota 57104

as Surety, hereinafter called Surety, are held and firmly bound unto __Canyon Building & Design, LLC__
(Here insert full name and address or legal title of Owner)
4750 N. LaCholla Blvd, Tucson, AZ  85705

as Obligee, hereinafter called Owner, for the use and benefit of claimants as hereinbelow defined, in the amount of

Ten Million, One Hundred Thousand..................................00/100 _____ Dollars ($ 10,100,000.00 _____ ),
(Here insert a sum equal to at least one-half of the contract price)

for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.
WHEREAS, _____ NRB(USA), INC. _____

Principal has by written agreement dated __December 6th__ _____ , __2013__ , entered into a contract with Owner for

Basis Brooklyn, Private School Project, 556 Columbia St., Brooklyn, NY in accordance with Drawings and Specifications prepared by

Partners for Architecture, PC. 48 Union Street Stamford.
(Here insert full name and address or legal title of Architect)

which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1. A claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2. The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.

3. No suit or action shall be commenced hereunder by any claimant:

a) Unless claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: the Principal, the Owner, or the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or

furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Owner or Surety, at any place where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid project is located, save that such service need not be made by a public officer.

b) After the expiration of one (1) year following the date on which Principal ceased Work on said Contract, it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

c) Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in which the Project, or any part thereof, is situated, and not elsewhere.

4. The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of mechanics' liens which may be filed of record against said improvement, whether or not claim for the amount of such lien be presented under and against this bond.

Signed and sealed this __12th__ day of __December__ _____ __2013__   NRB(USA), INC.

__(signature)__
(Witness)

__(signature)__
(Principal) (Seal)

GENERAL MANAGER
(Title)

__(signature)__
(Witness)

WESTERN SURETY COMPANY
(Surety) (Seal)

A. Arthur McCullagh, Attorney-in-Fact

Revised to February, 1970 Martin Hovey, Attorney-in-Fact
SB 6716b (3) Printed in U.S.A.



# Western Surety Company

## POWER OF ATTORNEY APPOINTING INDIVIDUAL ATTORNEY-IN-FACT

Know All Men By These Presents, That WESTERN SURETY COMPANY, a South Dakota corporation, is a duly organized and existing corporation having its principal office in the City of Sioux Falls, and State of South Dakota, and that it does by virtue of the signature and seal herein affixed hereby make, constitute and appoint

**A Arthur Mc Cullagh, Martin Havey, Jim U Grieve Sr, Elaine B Maloney, Richard Sarabando, Olga Savo, Michael Tinker, Individually**

of Markham, ON, its true and lawful Attorney(s)-in-Fact with full power and authority hereby conferred to sign, seal and execute for and on its behalf bonds, undertakings and other obligatory instruments of similar nature

### - In Unlimited Amounts -

and to bind it thereby as fully and to the same extent as if such instruments were signed by a duly authorized officer of the corporation and all the acts of said Attorney, pursuant to the authority hereby given, are hereby ratified and confirmed.

This Power of Attorney is made and executed pursuant to and by authority of the By-Law printed on the reverse hereof, duly adopted, as indicated, by the shareholders of the corporation.

In Witness Whereof, WESTERN SURETY COMPANY has caused these presents to be signed by its Vice President and its corporate seal to be hereto affixed on this 18th day of October, 2012.

WESTERN SURETY COMPANY

Paul T. Bruflat, Vice President

State of South Dakota
County of Minnehaha } ss

On this 18th day of October, 2012, before me personally came Paul T. Bruflat, to me known, who, being by me duly sworn, did depose and say: that he resides in the City of Sioux Falls, State of South Dakota; that he is the Vice President of WESTERN SURETY COMPANY described in and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed pursuant to authority given by the Board of Directors of said corporation and that he signed his name thereto pursuant to like authority, and acknowledges same to be the act and deed of said corporation.

My commission expires

June 23, 2015

J. MOHR
NOTARY PUBLIC
SOUTH DAKOTA

J. Mohr, Notary Public

### CERTIFICATE

I, L. Nelson, Assistant Secretary of WESTERN SURETY COMPANY do hereby certify that the Power of Attorney hereinabove set forth is still in force, and further certify that the By-Law of the corporation printed on the reverse hereof is still in force. In testimony whereof I have hereunto subscribed my name and affixed the seal of the said corporation this __12th__ day of __December__, __2013__.

WESTERN SURETY COMPANY

L. Nelson, Assistant Secretary

Form F4280-7-2012

**Authorizing By-Law**

## ADOPTED BY THE SHAREHOLDERS OF WESTERN SURETY COMPANY

This Power of Attorney is made and executed pursuant to and by authority of the following By-Law duly adopted by the shareholders of the Company.

Section 7.  All bonds, policies, undertakings, Powers of Attorney, or other obligations of the corporation shall be executed in the corporate name of the Company by the President, Secretary, and Assistant Secretary, Treasurer, or any Vice President, or by such other officers as the Board of Directors may authorize.  The President, any Vice President, Secretary, any Assistant Secretary, or the Treasurer may appoint Attorneys in Fact or agents who shall have authority to issue bonds, policies, or undertakings in the name of the Company. The corporate seal is not necessary for the validity of any bonds, policies, undertakings, Powers of Attorney or other obligations of the corporation.  The signature of any such officer and the corporate seal may be printed by facsimile.