

December 3, 2015

**VIA ECF**

The Honorable Roanne L. Mann
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 1220
Brooklyn, New York 11201

      Re:   *Canyon Building & Design, LLC v. NRB (USA), Inc., et al.*
              No. 15-cv-1694 (JBW) (RLM)

Dear Judge Mann:

      This firm represents Defendants NRB (USA), Inc., Western Surety Company, and CNA Surety, Inc. This correspondence is submitted as a request for a telephone conference amongst all Counsel and the Court, with respect to tomorrow's scheduled deposition of Andrew McLaughlin of Schoolhouse Project.

      By way of brief background, on October 22, 2015, we served a Notice of Deposition for Andrew McLaughlin on Counsel for Canyon Building & Design, LLC ("Canyon"). We proceeded with a Notice of Deposition because the record strongly suggested that McLaughlin was an employee of Canyon during the relevant time period, as noted by the Court. (*See* Nov. 17, 2015 Mem. 11 n.6, ECF No. 80 (noting McLaughlin's use of a Canyon email address and assuming that he is an employee or agent of Canyon).) Thereafter, we were informed by Counsel for Canyon that McLaughlin was not an employee, and would require a subpoena to appear for a deposition. A Subpoena was promptly served on McLaughlin, noticing his deposition for November 13, 2015. (McLaughlin Subpoena and Affidavit of Service, attached as Exhibit A.)

      Prior to the November 13, 2015 deposition, efforts were undertaken to confirm McLaughlin's attendance. Through telephone conversations, McLaughlin represented that he was never served with the Subpoena.[1] However, McLaughlin represented in subsequent email

---

      [1] During a telephone call with McLaughlin, undersigned Counsel requested if McLaughlin was represented by counsel for purposes of the deposition. McLaughlin responded that Counsel for Canyon, Flora Edwards, Esquire, was his attorney. In a subsequent telephone conversation with Ms. Edwards, it was represented that McLaughlin is not, in fact, represented by Ms. Edwards.

Honorable Roanne L. Mann
December 3, 2015
Page 2

correspondence that he was available for a deposition on December 4, 2015. (McLaughlin-Camarota Emails, attached as Exhibit B.) To accommodate his schedule, a revised Subpoena, noticing the deposition for December 4, 2015, was sent to McLaughlin via email with a request that he accept service of the same. (*Id.* at Nov. 5, 2015 email to McLaughlin.) McLaughlin responded: "*I am confirming that date and I will attend.*" (*Id.* at Nov. 6, 2015 email from McLaughlin.)

Based upon McLaughlin's representations, Defendants proceeded under the assumption that McLaughlin was to be deposed on December 4. Indeed, all Parties represented to the Court that the deposition was to proceed on December 4, in their respective Status Reports filed on November 25, 2015. (Pl. Status Rep. 1, ECF No. 82; Defs.' Status Rep. 2, ECF No. 83.) And based upon those representations, the Court established specific deadlines for Canyon's production of additional documents and the Parties' joint letter regarding the submission of additional briefing on the outstanding privilege issues. (Nov. 25, 2015 Ord. 2, ECF No. 84.)

However, on December 1, 2015, Defendants' local Counsel, Tesser & Cohen, received a telephone message from John Mastropietro, Esquire, who stated that he represented McLaughlin and was requesting that the December 4 deposition be postponed. Undersigned Counsel wrote to Mr. Mastropietro on December 1 informing him of McLaughlin's express agreement to appear on December 4 and of the need to proceed on that date in accordance with the Court's established deadlines. No response was received to that letter. On December 3, 2015, during a brief telephone call, Mr. Mastropietro confirmed that he did represent McLaughlin and Schoolhouse Project, and that they had no intention of appearing at the deposition tomorrow based upon Counsel's purported scheduling conflict.

The Court is no doubt well aware that McLaughlin is a critical witness to this matter. Canyon's principal, David Gerovac testified at his deposition that McLaughlin served such a critical supervision and management role in the project that he was compensated on a $20,000 monthly fee. (Gerovac Dep. 75:7-77:24, attached as Exhibit C.) Canyon's project manager, Martin Giroux, testified that McLaughlin was a highly "trusted" project manager, "heavily involved" in the day-to-day operation of the project. (Giroux Dep. 35:24-36:13, 87:10-25, 89:3-90:4, attached as Exhibit D.) Further delay of McLaughlin's deposition severely prejudices Defendants in the preparation of their case.

Furthermore, a Subpoena *duces tecum* was served on Schoolhouse Project on July 20, 2015, requesting relevant documents. Schoolhouse failed to respond to the Subpoena. Counsel for Schoolhouse and McLaughlin was apprised of the same. Defendants have offered to forego documents post-February 2015 until after all outstanding privilege issues have been resolved. However, Defendants have not received any indication as to when any documents may be forthcoming.

Honorable Roanne L. Mann
December 3, 2015
Page 2

      McLaughlin is under a Subpoena to appear and testify at a deposition tomorrow, December 4. If he wishes not to attend, he will be in contempt of that Subpoena. Defendants respectfully request a telephone conference with the Court amongst all Counsel. We are available at the Court's convenience and are willing to coordinate the scheduling and initiation of the Conference between Counsel.

      On behalf of Defendants NRB (USA), Inc., Western Surety Company, and CNA Surety, Inc., we thank the Court for its time and consideration.

                                        Respectfully submitted,

                                        WOOLFORD LAW, P.C.

                                        Francis A. Camarota

cc:     Flora Edwards, Esquire
         John Mastropietro, Esquire
         Stephen Winkles, Esquire
         NRB (USA), Inc.

# EXHIBIT A

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | |
|---|---|
| CANYON BUILDING & DESIGN, LLC </br> *Plaintiff* </br> v. </br> NRB (USA), INC., WESTERN SURETY COMPANY, and CNA SURETY, INC. </br> *Defendant* | Civil Action No. 15-1694 |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: ANDREW MCLAUGHLIN
c/o Schoolhouse Project, 77 Water Street, 8th Floor, New York, NY 10005-4201

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Tesser & Cohen </br> 946 Main Street </br> Hackensack, NJ 07601 | Date and Time: </br> 11/13/2015 9:00 am |
|---|---|

The deposition will be recorded by this method: Certified Court Reporter and Videographer

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/26/15

CLERK OF COURT         OR         *[signature]*

*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* NRB (USA), Inc., Western Surety Company, and CNA Surety, Inc._____, who issues or requests this subpoena, are:

Timothy J. Woolford, Esquire, Woolford Law, P.C., 101 N. Pointe Blvd., Suite 200, Lancaster, PA 17601; (717) 290-1190; twoolford@woolfordlaw.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 15-1694

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Andrew McLaughlin c/o Schoolhouse Project on *(date)* 10-26-2015.

☒ I served the subpoena by delivering a copy to the named individual as follows: Accepted by an employee of Schoolhouse Project Named: Elaine who would not provide last name on *(date)* Thursday, 10-29-2015 03:25 PM ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 64.00

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: 10-29-2015

*Server's signature* Darlene S. Greene  10-29-2015

*Printed name and title* Darlene S. Greene – Process Server

Darlene S. Greene
Process Server
DtNo: 10292015

*Server's address* POB 1085, Bronx, NY 10471-0600

Additional information regarding attempted service, etc.:

WO: 186712

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT B

# Francis Camarota

| | |
|---|---|
| **From:** | andrew@schoolhouseproject.net |
| **Sent:** | Friday, November 06, 2015 12:37 PM |
| **To:** | Francis Camarota |
| **Cc:** | 'Tim Woolford'; 'Flora Mancuso'; 'Candace Perez'; 'Carlo Schiattarella'; 'Stephen Winkles' |
| **Subject:** | RE: Canyon Building & Design v. NRB (USA), Inc. |

I am confirming that date and I will attend. Please mail any correspondences to my office address listed below. Thank you

Respectfully;

**SchoolhouseProject**

**Andrew J. McLaughlin** | *Co-Founder & COO*
New York City / New York / USA
www.schoolhouseproject.net

77 WATER STREET | 8TH FLOOR
NEW YORK CITY, NY 10005-4201 USA
**MOBILE:** +1.973.464.5919
**TEL:** +1 646.722.4219 | **FAX:** +1646.722.4101
**E-MAIL:** andrew@schoolhouseproject.net

*"Creating Extraordinary Schools for Sustained Success"*

-------- Original Message --------
Subject: RE: Canyon Building & Design v. NRB (USA), Inc.
From: "Francis Camarota" <fcamarota@woolfordlaw.com>
Date: Thu, November 05, 2015 12:15 pm
To: <andrew@schoolhouseproject.net>
Cc: "'Tim Woolford'" <twoolford@woolfordlaw.com>, "'Flora Mancuso'"
<fmelaw@aol.com>, "'Candace Perez'"
<candace.perez@interstatefireandsfty.net>, "'Carlo Schiattarella'"
<carlo@schoolhouseproject.net>, "'Stephen Winkles'"
<swinkles@tessercohen.com>

Mr. McLaughlin:

Thank you for your response. I can confirm that Friday, December 4, 2015 will work for the deposition. Attached to this email is a new copy of the Subpoena, noticing the deposition for December 4 at 9:00 A.M. at Tesser & Cohen, 946 Main Street, Hackensack, NJ. Please confirm that you have received and accepted service of the attached Subpoena.

In addition, kindly provide your preferred mailing address so that we may forward the standard witness fee to you. If you will be represented by counsel at the deposition, please also provide that attorney's name and contact information. Many thanks again.

Frank

Francis A. Camarota

1

Woolford Law, P.C.
101 North Pointe Boulevard
Suite 200
Lancaster, PA 17601
p. 717.290.1190
f. 717.290.1196
www.woolfordlaw.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This communication contains CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY
PRIVILEGED and is intended only for the use of the intended recipient(s)
identified above.  If you are not the intended recipient of this communication,
you are hereby notified that any use, dissemination, downloading, or copying of
this communication is strictly prohibited.  If you have received this
communication in error, please immediately notify me by e-mail at
fcamarota@woolfordlaw.com or by telephone at (717) 290-1190.  Please then delete
the communication and destroy all copies.  Thank you.

**From:** andrew@schoolhouseproject.net [mailto:andrew@schoolhouseproject.net]
**Sent:** Thursday, November 05, 2015 1:53 PM
**To:** Francis Camarota
**Cc:** 'Tim Woolford'; Flora Mancuso; Candace Perez; Carlo Schiattarella
**Subject:** RE: Canyon Building & Design v. NRB (USA), Inc.

I am available on December 4th.  Please confirm. Thank you

Respectfully;

**Andrew J. McLaughlin** | *Co-Founder & COO*
New York City / New York / USA
www.schoolhouseproject.net

77 WATER STREET | 8TH FLOOR
NEW YORK CITY, NY 10005-4201 USA
MOBILE: +1.973.464.5919
TEL: +1 646.722.4219 | FAX: +1646.722.4101
E-MAIL: andrew@schoolhouseproject.net

*"Creating Extraordinary Schools for Sustained Success"*


-------- Original Message --------
Subject: RE: Canyon Building & Design v. NRB (USA), Inc.
From: "Francis Camarota" <fcamarota@woolfordlaw.com>
Date: Thu, November 05, 2015 7:47 am
To: <andrew@schoolhouseproject.net>
Cc: "'Tim Woolford'" <twoolford@woolfordlaw.com>

Mr. McLaughlin:

To follow-up on our telephone conversation yesterday and the voicemail
that I left you, would you kindly provide your current address?  You are
entitled to a witness fee for the deposition, and we will need the address
to send you a check for the same.  Many thanks.

2

Frank

**Francis A. Camarota**
**Woolford Law, P.C.**
101 North Pointe Boulevard
Suite 200
Lancaster, PA 17601
p. 717.290.1190
f. 717.290.1196
www.woolfordlaw.com

**********************************************************

This communication contains CONFIDENTIAL INFORMATION WHICH ALSO MAY BE
LEGALLY PRIVILEGED and is intended only for the use of the intended
recipient(s) identified above.  If you are not the intended recipient of
this communication, you are hereby notified that any use, dissemination,
downloading, or copying of this communication is strictly prohibited.  If
you have received this communication in error, please immediately notify me
by e-mail at fcamarota@woolfordlaw.com or by telephone at (717) 290-
1190.  Please then delete the communication and destroy all copies.  Thank
you.

**From:** Francis Camarota [mailto:fcamarota@woolfordlaw.com]
**Sent:** Wednesday, November 04, 2015 5:23 PM
**To:** 'andrew@schoolhouseproject.net'
**Cc:** 'Tim Woolford'
**Subject:** Canyon Building & Design v. NRB (USA), Inc.

Mr. McLaughlin:

This will confirm our telephone conversation earlier today.  As I indicated, our firm represents NRB (USA), Inc., with regard to the above captioned litigation.  In connection with that litigation, we have subpoenaed you for a deposition.  (A copy of the Subpoena is attached.)  The deposition will occur on Friday, November 13, 2015, starting at 9:00 A.M., at the law offices of Tesser & Cohen, 946 Main Street, Hackensack, New Jersey.

Kindly confirm that you have received this email and the attached Subpoena.

Thank you.

Frank

3

**Francis A. Camarota**
**Woolford Law, P.C.**
101 North Pointe Boulevard
Suite 200
Lancaster, PA 17601
p. 717.290.1190
f. 717.290.1196
www.woolfordlaw.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This communication contains CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipient(s) identified above.  If you are not the intended recipient of this communication, you are hereby notified that any use, dissemination, downloading, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify me by e-mail at fcamarota@woolfordlaw.com or by telephone at (717) 290-1190.  Please then delete the communication and destroy all copies.  Thank you.

# EXHIBIT C

Page 1

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
                CIVIL ACTION NO: 1:15-cv-01694-JBW-RLM
```

CANYON BUILDING & DESIGN, LLC.        )
                                      )
              Plaintiff,              )
                                      )
    -vs-                              )
                                      )
NRB (USA), INC. and WESTERN           ) DEPOSITION OF:
SURETY COMPANY, CNA SURETY,           )
INC.,                                 ) DAVID GEROVAC
                                      )
              Defendants.             )
                                      )
and                                   )
                                      )
NRB (USA), INC.,                      )
                                      )
        Third Party Plaintiff         )
                                      )
    -vs-                              )
                                      )
GREAT AMERICAN INSURANCE              )
COMPANY                               )
                                      )
        Third Party Defendant         )
                                      )

_____

        TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before PAMELA ADAMO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at the office of TESSER COHEN, ESQS, 946 Main Street, Hackensack, New Jersey, on November 11, 2015, commencing at 9:05 a.m.

Gerovac - direct

Page 74
1  a conversation with -- was your conversation about
2  working in New York for this project with Mr. Block?
3     A.    Yes.
4     Q.    Was anyone else present?
5     A.    We had multiple conversations. I had
6  conversations with Michael Block and Olga Block. I
7  had conversations with Mark Reford who is staff.
8     Q.    Did they ask you if you were interested
9  in working in New York?
10    A.    Yes.
11    Q.    What did you say?
12    A.    Yes.
13    Q.    Was there any discussion about your
14 experience working in New York?
15    A.    Yes. Same as discussion about have they
16 ever opened a school in New York.
17    Q.    Did you feel qualified to work on a $30
18 million project in New York?
19    A.    Yes, we did. It was not the dollar
20 amount. We looked at the square footage and its
21 square footage is right in the wheelhouse of multiple
22 projects Canyon has done in the past throughout the
23 country.
24    Q.    Had you ever worked on a project with
25 Partners in Architecture before?

Page 75
1     A.    No, we had not.
2     Q.    Did you have any relationships with
3  subcontractors in New York?
4     A.    No, we did not. We relied on our
5  professional team that we hired and we also vetted
6  the subcontractors.
7     Q.    How did you come to know Andrew
8  McLaughlin and Schoolhouse project?
9     A.    They were introduced to us by Highmark.
10    Q.    How so? Tell me about that
11 introduction?
12    A.    When we were looking for properties
13 throughout the area, entitlements, various things in
14 New York, they introduced us to Carlo and Andrew. We
15 developed a relationship with Carlo and Andrew
16 looking at their working history.
17    Q.    Initially in the project did you have
18 more involvement with Carlo during the permitting and
19 approval process than Andrew?
20    A.    I would say actually it was more of a
21 50/50. Carlo did definitely handle the permitting
22 process more and BSA and that kind of work. Andrew
23 handled more, he is the construction side of
24 Schoolhouse. He comes from a hospital background as
25 an owner's rep so he's aware of the, helping

Page 76
1  facilitate budgets, schedules. So it was more of
2  50/50.
3     Q.    Did you into a written agreement with
4  Schoolhouse project concerning their services?
5     A.    No.
6     Q.    How were they compensated?
7     A.    They're compensated on a monthly
8  invoice.
9     Q.    Based on what?
10    A.    Based on an agreement we have, on a fee.
11    Q.    Tell me about the terms of that
12 agreement or the parameters of the agreement as you
13 understand it?
14    A.    They're going to facilitate and assist
15 us in administrative, supervision duties as well as
16 help with permitting for their fee a month.
17    Q.    And what about during the construction
18 phase?
19    A.    That goes right there with it. They're
20 going to help and assist and do background paperwork
21 change orders, make sure that it's tidy because the
22 field was working in the field, not just sitting in a
23 job trailer doing the paperwork.
24    Q.    What is the monthly, what is the monthly
25 fee that Schoolhouse project got or gets?

Page 77
1     A.    They get $20,000 a month.
2     Q.    When did the $20,000 a month start?
3     A.    I would have to refer back to the file,
4  but I would say when construction started. Prior to
5  that it was $10,000 a month.
6     Q.    Is that in writing anywhere?
7     A.    No, it is not.
8     Q.    It's just a handshake?
9     A.    It's a verbal agreement, yes.
10    Q.    Why didn't you enter into a written
11 agreement with Schoolhouse project?
12    A.    Because it's a month-to-month agreement
13 with them.
14    Q.    Is there anybody else associated with
15 Schoolhouse other than Carlo and Andrew that you
16 dealt with?
17    A.    In the very beginning of the project
18 they had an assistant that we dealt with as well.
19    Q.    Are either Carlo or Andrew a licensed
20 architect or engineer?
21    A.    No, they are not. Andrew, I think, had
22 a couple of years of architecture in college and
23 that's it. If memory serves me correctly Carlo's
24 background is finance, I think.
25    Q.    Do you know if the fees paid to

Veritext Legal Solutions
800-227-8440                                              973-410-4040

# EXHIBIT D

Page 1

```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
               CIVIL ACTION NO: 1:15-cv-01694-JBW-RLM
```

|   |   |
|---|---|
| CANYON BUILDING & DESIGN, LLC. | ) |
| Plaintiff, | ) |
| -vs- | ) DEPOSITION OF: |
| NRB (USA), INC. And WESTERN SURETY COMPANY, CNA SURETY, INC., | ) MARTIN GIROUX |
| Defendants. | ) |
| and | ) |
| NRB (USA), INC., | ) |
| Third Party Plaintiff | ) |
| -vs- | ) |
| GREAT AMERICAN INSURANCE COMPANY | ) |
| Third Party Defendant | ) |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before PAMELA ADAMO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at the office of TESSER COHEN, ESQS, 946 Main Street, Hackensack, New Jersey, on November 9, 2015, commencing at 9:37 a.m.

Giroux - direct

Page 34

1 financed the job.
2  Q.  Is there a punch list?
3  A.  Yes.
4  Q.  Any outstanding punch list items?
5  A.  Yes. They're down to the minimum now.
6 A lot of them are related to the changes.
7  Q.  All right. Is -- do you anticipate any
8 work to be done over the Thanksgiving or holiday
9 breaks? Usually a good time to punch things out on
10 school --
11  A.  No. We have a continuous crew that's
12 working after six because the school is active now.
13 So we have an agreement with them. We have crews
14 that are working a few days during the week after six
15 and then they're generally Saturdays and Sundays we
16 have free reign unless there is a school function
17 which may happen on a Saturday morning. But other
18 than that, we've been working different crews and
19 different people here and there.
20  Q.  What presence do you have at the site?
21  A.  Right now I go to the site maybe once a
22 week, twice a week and just show my face, oversight,
23 schedule any item and if we have any disputes just
24 work the disputes, but just once a week now.
25  Q.  Do you have a contact person at the

Page 35

1 school?
2  A.  We usually deal with Michael at the
3 school and we have a guy there that's, he's there
4 usually about 30 hours a week, 25/30 hours a week,
5 Dimas Wood. He's our assistant project manager.
6  Q.  Michael who?
7  A.  Michael Walshlager, he's from Wisconsin.
8 Don't ask me how to spell it.
9  Q.  You understand he's affiliated with
10 BASIS or Highmark?
11  A.  He works in the operations and the
12 maintenance department there. He is our contact for
13 access and he's our contact for coordinating
14 different areas for access.
15  Q.  Do you have any involvement with
16 negotiating contracts with NRB?
17  A.  No, none. None whatsoever.
18  Q.  Do you know who handled that at Canyon?
19  A.  I would say it was all in the team. I
20 know they had a team that met regularly up in
21 Connecticut which includes Highmark, Schoolhouse,
22 NRB, all the teams were getting together on several
23 occasions for the planning and budgets and...
24  Q.  What was your understanding of what role
25 Schoolhouse had in connection with the project?

Page 36

1  A.  They work, they're consultants and
2 coordinators. They work primarily with anything that
3 Dave asked them to do. They're well versed with
4 construction, construction management and techniques.
5 One partner is good at expediting, working with
6 expediters, getting permits pushed through, working
7 the city and the DOB; that would be Carlo and he's
8 also good with finding land and land acquisitions.
9      And then Andrew, he's more the nuts and
10 bolts guy. He works on the construction site. He's
11 good at day-to-day operations, change orders, e-mail
12 communications, he's great at communication. So that
13 was their role.
14  Q.  All right. So Carlo and Andrew?
15  A.  Yes.
16  Q.  Is Canyon doing any other work or is it
17 in pre-con for any other BASIS jobs?
18  A.  None that I know of.
19  Q.  Does Canyon have any other work in New
20 York or the New York area that you know of?
21  A.  No.
22  Q.  Was there an architect involved with a
23 BASIS project?
24  A.  Yes.
25  Q.  What is their name?

Page 37

1  A.  The architect in Tucson that had the
2 original building design development is Phil Carhuff
3 and his partner is Mark Cueva and then when the
4 project was brought up here they partnered with PFA
5 which is Professionals for Architecture.
6  Q.  Is it professionals or partners for
7 architecture?
8  A.  Professionals for Architecture, PFA and
9 they're out of Connecticut.
10  Q.  Who was your, did you have a point of
11 contact at Carhuff?
12  A.  Yes, that would be Phil. He has a long
13 relationship with Canyon and BASIS.
14  Q.  So you understood that Carhuff had done
15 other jobs or design jobs for BASIS and Canyon?
16  A.  Yes, with my familiarity of him, yes.
17  Q.  Were there any other BASIS schools that
18 used modular construction to this extent that you're
19 aware of?
20  A.  None that I'm aware of.
21  Q.  Did you become aware of what the
22 rationale was within the Canyon organization for
23 utilizing modular techniques on this project?
24  A.  I think it was a consensus of all the
25 teams together. The owner, the financiers, the

10 (Pages 34 - 37)

Giroux - direct

Page 86

1  Q. Was it important for them to accurately
2  record information in those daily reports?
3  A. As far as when we were having issues
4  yes.
5  Q. Were there meetings?
6  A. Yes.
7  Q. Who led the meetings at the job site?
8  A. It would have been me or Dimas or Andrew
9  depending on the structure of the meeting and the
10 content of the meeting. It could have been several
11 different people.
12 Q. Were minutes prepared?
13 A. We kept a to do list or a daily to do
14 list while we were putting together the modules and
15 we had a daily foreman's meeting or daily stand-up
16 meeting that we would just chase down coordination
17 issues, chase down scheduling issues.
18 Q. Okay. Were there minutes prepared of
19 meetings that occurred at the job site?
20 A. Yes. Some meetings had minutes and some
21 didn't, but some were just memorialized by e-mail or
22 just memorialized because the item was completed at
23 the time.
24 Q. Were there agendas?
25 A. Yes, there was agendas.

Page 87

1  Q. Did you prepare the agendas?
2  A. Some were prepared by me and some were
3  prepared by others.
4  Q. How often were the meetings?
5  A. We had meetings every week for the
6  trades and owners of the trades and then we primarily
7  had 15 to 30-minute meetings every day as far as
8  stand up, face-to-face meetings with the foreman and
9  on=site personnel.
10 Q. Did Andrew McLaughlin have a presence at
11 the site?
12 A. Yes.
13 Q. What was that presence?
14 A. He worked on the -- he worked with us in
15 regards to coordination, finding subcontractors,
16 getting the job laid out, initial budgets,
17 coordination with the DOB, the DOT, working with NRB,
18 he was heavily involved with NRB and the buyout with
19 NRB, day-to-day work.
20 Q. He was physically at the job site?
21 A. His office is actually downtown
22 Manhattan so he spent a lot of time in the office and
23 then he spends time at the job site when it's
24 required, but he would be there a couple of days a
25 week.

Page 88

1  Q. Does Canyon have an office in Manhattan?
2  A. They have an office downtown which is an
3  address and it's an office that we use for our
4  address.
5  Q. Is it the Regis office, Regis?
6  A. Yes. Yes, but it's not --
7  Q. It's a virtual office?
8  A. Yes, it is.
9  Q. Okay. And that's where McLaughlin is
10 too?
11 A. That's where he was located for a
12 majority of the project and we had a full-time office
13 there in the corner. It was half the size of this
14 room.
15 Q. At the job?
16 A. No, at the Regis Center we had an office
17 that we always had a key to that we always kept our
18 stuff in.
19 Q. And is McLaughlin an architect?
20 A. No.
21 Q. Is he an engineer?
22 A. I don't believe so.
23 Q. Is he an owner of Schoolhouse project?
24 A. Yes, he is a cofounder.
25 Q. Has he ever been an employee of Canyon

Page 89

1 to your knowledge?
2  A. No.
3  Q. Did he ever use Canyon's letterhead?
4  A. Yes.
5  Q. Why?
6  A. He was allowed to speak on behalf of
7 Canyon and David and he was allowed to. He had
8 e-mail address for Canyon and he used Canyon
9 letterhead.
10 Q. I mean how did that come to be that he
11 used Canyon's letterhead? Did he want to use it and
12 you acquiesced to it or did you tell him to do it?
13 A. No. He was, he was involved with the
14 project to the point he was trusted to, I'm sure
15 nothing went out without David's eye or my eye seeing
16 it first, but no, he was allowed to use the Canyon
17 letterhead and use the Canyon name. He was a trusted
18 person to the project.
19 Q. What was the point of him doing that?
20 Just to be able to demonstrate to subcontractors that
21 he had authority to make, to give direction?
22 A. No, I just think that because of the --
23 how heavily involved he was and the amount of
24 communication that he took care of between some of
25 the subcontractors, specifically NRB and the

23 (Pages 86 - 89)

Giroux - direct

Page 90

1 architects and the owners, Highmark. His day-to-day
2 work would warrant him using the letterhead. He was
3 known on the project. And this is the only project
4 he works with Canyon on.
5  Q.  Was there a contract, written contract
6 between Canyon and Schoolhouse?
7  A.  If there is it was before my time. I
8 wasn't privy to it.
9  Q.  Do you know, did you have any
10 involvement in looking at invoicing or the bills from
11 Schoolhouse to Canyon?
12  A.  No.
13  Q.  You were not asked to review them or?
14  A.  I reviewed bills. I'm sure if their
15 bill was in there, they're in there for a set fee and
16 it was, okay, just, if it was, it would have been a
17 formality, but no, I didn't take care of the
18 Schoolhouse bills or the Hartman bills or any of the
19 other bills that Canyon had with outside consultants.
20  Q.  Do you know how long Schoolhouse was in
21 existence before this project?
22  A.  No, I'm not familiar with their company.
23  Q.  Did you ever ask Andrew about that?
24  A.  No, it never came up.
25  Q.  Do you know what he did before

Page 91

1 Schoolhouse?
2  A.  He did construction management for
3 surgery center, a hospital for special surgery or
4 something like that.
5  Q.  Where?
6  A.  Here in New Jersey/New York area. And
7 they did some schools too.
8  Q.  Why are they called Schoolhouse project?
9  A.  Because I think his partner Carlo was
10 most interested in the schoolhouse and that would
11 have been his forte for the land acquisition, working
12 with charter schools, working with different
13 independent schools and public schools. So I think
14 it was his relationship with Carlo that brought him
15 to focus on schools or Schoolhouse. It's the name
16 that they came up with. I thought it was pretty
17 good.
18  Q.  Are they focused on the educational
19 industry?
20  A.  Now they are, yes.
21  Q.  Were they, before that were they focused
22 on some other industry?
23  A.  No, I know Carlo was focused on the
24 school industry and Andrew was at that hospital for
25 special surgery, but I don't know any other of their

Page 92

1 background besides that.
2  Q.  Did you know if Andrew generated any
3 written records of his daily activities at the site?
4  A.  He has an e-mail guru. So everything he
5 does is on e-mail. Yesterday I got about eighty
6 e-mails from him. So everything he does is on
7 e-mail. Everything.
8  Q.  So you're still e-mailing with him about
9 the project?
10  A.  Yes. Yes, we're still doing closeout,
11 we're still doing training, things like that, the
12 administrative paperwork, working with Tammy.
13  Q.  Was Carlo present at the job site as
14 much as Andrew?
15  A.  No, not as much as Andrew.
16  Q.  How often was Carlo there?
17  A.  I would say less than 25 percent of the
18 time, 20 percent of the time. Carlo was always there
19 when we had our meetings for expediting permits, TCO
20 fire alarm meetings, fire department meetings, so on
21 and so forth. He was our expediting guy and our
22 agency guy. So he wasn't there on the day-to-day
23 operations.
24  Q.  So Andrew was there a hundred percent of
25 the time like you, right.

Page 93

1  A.  He wasn't there a hundred percent of the
2 time. He was there, he was at his office a majority
3 of the time, then he would come to the job site, he
4 would be -- generally when Dave was at the job site
5 Andrew and Carlo would be at the job site. Other
6 than that if David was not there then Andrew would be
7 working at his office.
8  Q.  Do you know if Canyon had any other jobs
9 going on during 2014?
10  A.  In the New York area, no.
11  Q.  Anywhere?
12  A.  Oh, yes. On the east -- excuse me, on
13 west coast we did, yes.
14  Q.  Why? What other project did they have
15 going on?
16  A.  We work for BASIS schools and then we
17 work with car dealerships and we work with box
18 stores, food restaurant stores, retail stores.
19  Q.  Yes, but ongoing projects in '14?
20  A.  Ongoing in '14.
21  Q.  Yes.
22  A.  I know we had a couple ongoing projects
23 with BASIS and other than that, no, because I don't
24 keep up with everything they have going on in the
25 west coast.